## UNDERWOOD TYPEWRITER CO. v. ELLIOTT-FISHER CO.

(Circuit Court, S. D. New York. December 21, 1908.)

1. PATENTS (§ 65*) — ANTICIPATION — PRIOR PATENT OR PUBLICATION — REQUI-
SITES.

To constitute an anticipation, the prior patent or publication relied up-
on must, by descriptive words or drawings, or by both, contain and exhibit
a substantial representation of the patented improvement in such full,
clear, and exact terms as to enable any person skilled in the art to make
the article or practice the invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 80; Dec. Dig. §
65.*]

2. PATENTS (§ 62*)—SUIT FOR INFRINGEMENT—PROOF OF ANTICIPATION.

Anticipation must be proved by evidence so cogent as to leave no rea-
sonable doubt in the mind of the court.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 78; Dec. Dig. §
62.*]

3. PATENTS (§ 328*)—INFRINGEMENT—TABULATING ATTACHMENT FOR TYPEWRIT-
ERS.

The Gathright patent No. 436,916, for a tabulating attachment for type-
writers, held not anticipated, valid, and infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

In Equity. Suit for alleged infringement of United States letters
patent No. 436,916, to Josiah B. Gathright, relating to tabulating at-
tachments for typewriters.

See, also, 156 Fed. 588.

Briesen & Knauth (Eugene Eble, of counsel), for complainant.
Robert Fletcher Rogers, for defendant.

RAY, District Judge. The bill of complaint charges infringement
of claims 4 and 5 of United States letters patent No. 436,916, to Josiah
B. Gathright, dated September 23, 1890, applied for January 15, 1889.
The claims relate to tabulating apparatus attachments and read as
follows:

"(4) The combination of a stop-rod freely hung to the machine, a stop-lug
thereon, and a supplemental spacing-key hung in the machine and adapted to
move the said stop-lug into the path of a portion of the feed-carriage, and con-
nection between the stop-rod and rack-bar, substantially as shown and de-
scribed.

"(5) In a typewriter, the combination of the usual letter-keys and one or
more spacing-keys having mechanism in common for permitting the carriage
to move a definite space at each stroke, and a supplemental spacing or skip-
ping key fitted to permit the carriage to move any desired number of said
spaces, according to adjustment, said key provided with independent mechan-
ism for releasing the carriage from the detent, and mechanism for simultane-
ously interposing an adjustable stop, substantially as shown and described."

In the specifications the patentee says:

"This invention relates to that class of typewriting machines which are
provided with feed-racks, or equivalent means for moving a carriage to space
between the letters upon each line—such, for example, as the Remington tpye-
writer, and the following description is made with reference to that machine.

"Heretofore, in producing writings in which some of the lines are not filled,
or in which open spaces occur, in order to bring certain words or figures into
accurate vertical columns—such writings, for example, as bills of goods, in-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

voices, statements of accounts, etc.—it has been necessary for the operator to pass the carriage over blank spaces either by repeatedly striking a spacing-key which feeds the carriage the space of only one letter at a time, or by unlatching the carriage and sliding it to the desired point by means of a hand-lever. Both of these methods are tedious, and they keep the mind of the operator under constant tension to remember the point where the carriage is to be stopped to register with the column, as desired, and the practice is common among operators of striking the first figure lightly and then turning the carriage up to see whether that figure registers properly before printing it in full. This method evidently requires many experiments at the expense of time, and tends greatly to perplex the operator.

"The object of my invention is to obviate these objections by providing means for automatically locating with the typewriter one or more columns of words or figures, and of mechanically skipping any intervening space desired to be left blank.

"To this end my invention consists in the construction and combination of parts forming a portion of a typewriting machine, as hereinafter described and claimed, reference being had to the accompanying drawings."

Then follows the description of the drawings, etc.

The patent then says:

"By the words 'supplemental spacing-key' I mean a key like the key 18, which is exclusively devoted to the following duty, to wit: First, to disengage the carriage-rack from the detent, and to hold it disengaged until the carriage, traveling its usual path, has passed over a space including a number of letter-spaces, which it was desirable to skip, to a stop whose location is adjustable, and was predetermined to fit said skipped space; and, second, to remove the said stop by the act of releasing the said spacing-key, thus permitting the carriage to resume service at the usual letter-spaces. Such a key I contrast with keys which allow the carriage to advance but one letter-space at a time; also with the common hand-lever, whereby the carriage may be raised from its usual path and be carried over any number of letter-spaces. I also contrast it with any key adapted by light pressure to advance the carriage a single letter-space, and by a heavier pressure to entirely release the carriage, so that it may travel over a number of letter-spaces to a stop. This latter key would be in constant danger of being overpressed, so that it would skip at the wrong time, thus keeping the operator's mind under constant tension to weigh the force of his stroke, which would defeat a prominent object of my invention. My supplemental spacing-key has only one service to perform. When it is pressed down in operation, it releases the carriage-detent and places an adjusted stop in the path of the carriage to arrest it at the desired point. On permitting the supplemental spacing-key to rise, it withdraws the stop from the path of the carriage, leaving it free to resume work, as usual."

The operation is then described, and then comes the following

"It would require only ordinary mechanical skill to adapt my stop rod and lugs to any kind of a self-feeding typewriting machine by following out the principle of construction herein described. Therefore I deem it unnecessary to illustrate its application to the great variety of typewriting machines which have been invented.

"The great advantage of being able to skip a space of uncounted letters and stop the carriage again at a single stroke of a key, so as to accurately align figures or words in column, is too obvious to require further demonstration.

"Because of the necessary changes in details of construction that would naturally result from the adaptation of my invention to different styles of typewriting machines, I do not wish to confine my claims to the specific device herein described."

This patent has been the subject of considerable litigation and held valid by the Circuit Court of Appeals. Wagner Typewriter Co. v. Wyckoff Seamans & Benedict, 151 Fed. 585, 81 C. C. A. 129; and

see, also, Wagner Typewriter Co. v. American Writing Mach. Co., 151 Fed. 576, and 156 Fed. 588. The patents to Schulte, No. 450,592 to McCormack, No. 439,544, and to Yost, No. 401,990, have been fully considered on the question of anticipation and construction of the patent in suit, and I will not go into them in detail.

In addition to these patents, the defendant now urges the Raggett (English) patent, No. 1,864, granted to one John James Raggett May 6, 1880, as an anticipation. In the provisional specifications of that patent we find the following:

"I provide a device, termed the paper regulating stop, as follows: This is a stop fixed either on the traversing bars or in such a position that the carriage may come in contact therewith; it may consist of a ring made to slide on the traversing bar, and kept in position by a pin which shall fasten the ring to the traversing bar, and so stop the carriage at the required position to suit the size of the paper. I provide a device for regulating the spaces for £ s. d. and yds., ft., and ins., which may consist of a series of adjustable arms attached to a spindle, which arms stop the paper carriage at the required position."

And in the full specifications the following:

"I provide a device termed a paper regulating stop. This stop is fixed either on the traversing bar, or in such a position that the carriage may come in contact therewith; it may consist of a ring made to slide on the traversing bar, and kept in position upon the same by a pin, and so arranged as to stop the paper carriage at the required position to suit the size of the paper. I also provide a device for regulating the spaces for £ s. d., and yds., ft., and ins. This device may consist of an adjustable stop, as shown in side view in Fig. 46, or of a series of adjustable arms attached to a spindle, which arms stop the paper carriage in the required position."

What this device is, how it works, and what it accomplishes is a matter of conjecture. It is neither described nor illustrated. It points out nothing like the combination of the device of the patent in suit, which consists, in claim 4, of the combination of 1, a stop rod freely hung to the machine; 2, a stop lug on the stop rod; 3, a supplemental spacing-key hung in the machine which is adapted to move the stop-lug into the path of a portion of the feeding carriage; and 4, connection between the stop-rod and rack-bar as shown and described. The mechanism and connections and supplemental spacing-key for making the device operative and of value are fully shown and described. Says the Gathright patent:

"10 represents the upper table of the fixed frame of the machine, and 11 a permanent vertical post thereof, to which I have pivoted an arm 12 by means of a pivot-bolt 13.

"14 is my lift-slide and stop-rod, adjustable longitudinally of the machine through the upper portion of the arm 12, and 15 is a set-screw, whereby the rod may be firmly secured in the arm at any required point in the length of the rod. This rod is normally supported close beneath some cross portion— such as the arm 16 of bar 5—by means of the lever 17 and a connecting-rod 19. The lever 17 is pivoted to the frame of the machine at 20, and is provided with a supplemental spacing-key 18, whereby its forward end may be pressed down to raise its rear end and the rods 19 and 14, and with them to raise the rack-bar 5 out of engagement with the detent 6. That would permit the carriage to slide or be fed freely in the direction of the arrow 7.

"21 and 22 represent stop-lugs provided with set-screws, whereby they may be adjusted to any desired points upon the rod and there be fixed firmly to it, so that when the rod 14 is in service the lugs 21, 22, are in the path of arm

16 to stop it. There may be any desired number of these lugs, each serving as a shoulder upon the rod 14 to catch and stop the carriage from sliding farther. Then the key 18 being released, the rod 14 returns to its normal position, whereby the stopping-shoulder is removed, and the arm 16 is free to be fed along over the stop 21 by the regular operation of the machine.

"23 represents a spring attached to the post 11, and constantly bearing its free end against the arm 12 to insure the return of the whole skipping device to its normal position more quickly than it would do when actuated by gravity alone."

I find no suggestion of this in the Raggett patent. With the Raggett patent before him, the mechanic skilled in the art would find nothing whatever to suggest the combination of Gathright except a lug on a rod or arms on a spindle which would stop the progress of the carriage when brought in contact with it or them. The defendant's experts have made certain drawings which they claim illustrate the Raggett device. The difficulty with these is that, in the light of the Raggett machine and the state of the art at that time, they are mostly, if not wholly, imaginary. In the light of the art as now developed they follow it, and evidently are based upon it. Raggett neither shows, nor describes, nor suggests what these experts illustrate as the Raggett invention. Raggett may have had some such device in mind, but he invented nothing of the kind, or if he did, so far as appears, he neither constructed it, had it constructed, nor described nor illustrated it. Whatever he had in mind, he left the world in substantially the same darkness that prevailed before, so far as this particular part of the art is concerned. The device of Raggett was neither a mechanical nor a commercial success. Clearly it was not a tabulating device.

It is well settled that to constitute anticipation the prior patent or publication relied upon must, by descriptive words or drawings, or by both, contain and exhibit a substantial representation of the patented improvement in such full, clear, and exact terms as to enable any person skilled in the art or science to which it appertains to make, construct, and practice the invention. Also anticipations of patents must be proven by evidence so cogent as to leave no reasonable doubt in the mind of the court. Seymour v. Osborne, 11 Wall. 516, 555, 20 L. Ed. 33; Sewall v. Jones, 91 U. S. 171, 194, 196, 23 L. Ed. 275; Cohn v. U. S. C. Co., 93 U. S. 366, 370, 23 L. Ed. 907; Bates v. Coe, 98 U. S. 31, 44, 25 L. Ed. 68; Deering v. Winona, etc., 155 U. S. 286, 15 Sup. Ct. 118, 39 L. Ed. 153; Crown Cork & Seal Co. v. Standard Stopper Co. (C. C.) 136 Fed. 199. In this case it was held that—

"a prior publication in a paper, patent, or otherwise will not negative the novelty of an invention unless it describes a complete and operative invention capable of being put into practical operation, or contains such a disclosure of the invention that any omission would ordinarily be supplied by one skilled in the art" (per Townsend, C. J.).

In American G. Co. v. Leeds (C. C.) 87 Fed. 873, 876, Judge Shipman said, in substance, that a court is not called upon to struggle to decipher an anticipation in the unfinished work and surmises of earlier students on the same subject, and I am of the opinion that a court is not justified in finding anticipation in an old and discarded device, the meaning of which is obscure and puzzles experts.

I have patiently read the evidence of the experts on the subject of this Raggett patent, as well as the Raggett specifications and claims. He evidently reversed the movement of his forced feed-carriage when writing figures. Just what he did or how he intended to operate when he used a "series of arms attached to a spindle," which arms stopped the paper carriage in "the required position," is a matter of conjecture, and I am unable to ascertain what the "required position" was. He gives no information on that subject. I cannot adopt the opinions of defendant's experts. And for a mechanic to say that he can base an opinion on the art as it existed when he was a boy, and not have that opinion affected by the art as it now exists, and which is far in advance of the old art, is to say that he has a mind capable of forgetting and ignoring all that is modern and really practical and must be impressed upon him, and only remembering that which is old and impracticable and of which he has no practical knowledge whatever

Entertaining these views, and having due regard to the opinion and holding of the Circuit Court of Appeals where the other alleged anticipatory patents were fully considered and to which reference has been made, I hold that the defense is not sustained; that the patent is valid, and has been infringed by defendant; but as the patent has expired no injunction can be granted, and there will be a decree for the complainant for an accounting, with costs.