## AMERICAN ENGINEERING CO. v. FREDERICK ENGINEERING CO. et al.

### (District Court, D. Maryland. August 8, 1921.)

### No. 216.

**Patents ⬅⟶328—778,812, for underfeed stoker, held valid and infringed.**
    The Taylor patent, No. 778,812, for an underfeed stoker, claims 1, 2, 3, and 5, *held* not anticipated, valid, and infringed.

In Equity. Suit by the American Engineering Company against the Frederick Engineering Company and the Frederick Iron & Steel Company. Decree for complainant.

Fish, Richardson & Neave, of Boston, Mass., and Edwin F. Samuels, of Baltimore, Md., for plaintiff.

N. Rufus Gill & Sons, of Baltimore, Md., Jonathan S. Green and E. W. McCallister, both of Pittsburgh, Pa., for defendants.

ROSE, District Judge. The plaintiff, the American Engineering Company, charges the defendants, the Frederick Engineering Company and the Frederick Iron & Steel Company, with uniting, the former to make and the latter to sell, underfeed stokers, in infringement of its patent, No. 778,812, issued December 27, 1904, to one Taylor. The defenses are invalidity and noninfringement.

There is no question that the plaintiff, its predecessors and its licensees, in accordance with what it and they claim to be the teachings of the patent, have manufactured and sold stokers containing an aggregate of 40,000 retorts, rated to develop 4,000,000 horse power, and for which they have received some $29,000,000. If these structures are covered by the first, second, third, and fifth claims of the patent in suit, as plaintiff says they are, defendants infringe, for the difference between the stokers turned out by defendants and those marketed by the plaintiff and its various licensees are for the purposes of this case without legal significance. Defendants knew precisely what they were doing. The Frederick Iron & Steel Company, during the World War, when plaintiff's facilities were overtaxed, was employed by the latter to make parts of its stokers for it. One of the organizers and the manager of the other defendant came to it, fresh from one of plaintiff's licensees, where he had been engaged in making the licensed stokers, and some years earlier he had been in the employ of one of plaintiff's predecessors.

The defense of noninfringement rests upon the contention that what plaintiff itself makes is not the stoker described in the patent, and covered by the claims in suit, to which is added the assertion that, if the patent and claims be given a construction broad enough to cover the devices made by plaintiff and by defendants, they are invalid for lack of patentable novelty.

For thousands of years, men have fed fires by throwing fuel upon them. Eighty years or more ago it was suggested that, under some conditions, it might be better worth while to push the combustibles up

⬅⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

into the flames from below. Where coal was used, the underfeed had the great advantage of securing the burning in large part of the gases which it gives forth as it approaches ignition, and thereby turning to profitable use valuable heat-producing material which would otherwise be wasted, to the pollution of the adjacent air. For something like a half century, nothing that counted for much was done to put this idea into practice. Inventors here and abroad obtained patents for various designs of underfeed furnaces, and in the 70's and the 80's some of these structures went into limited use; but it was not until the last decade of the expiring century that the underfed stoker became industrially important.

The plaintiff seems justified in its assertion "that its use on any extensive scale was made possible by three inventions," for each of which American patents were granted, viz. that to Jones, letters patent 470,052; to Roe, 566,871; and to Daley, 644,664. All of these were applied for in the five years between June, 1891, and March, 1896. Without pausing to analyze them in detail, it suffices to say that before Taylor came into the field there were in quite general use underfed stokers with retorts comparatively narrow in proportion to their length, and to a less degree to their depth. Into these the coal was fed by two or more pushers so arranged that the principal work was done by one of comparatively long stroke operating from the fuel receiving end of the retort, and by one or more auxiliary or secondary pushers of short stroke applying their force to the fuel at a point or points some distance from that at which it came into the receptacle. The pressure of these pushers caused the coal to rise in the retorts as well as to move along them. To support combustion, there were at the top or on the sides of the retort, passages through which air came, under pressure when that was desirable. On each side of those retorts, which were equipped for forced draft, there were dead plates upon which there was some burning of the coal, and upon which ashes and clinkers collected.

Such stokers were highly useful for many purposes, but they were not well suited to the requirements of those who wanted a continuous fire bed of relatively extended area, the demand for which is of this century. Boilers to develop 300 horse power were formerly as powerful as any one had use for. Now it is sometimes worth while to have them with a capacity 10 times as great. Until the Taylor stoker came upon the market, there was but little advantage in multiple retorts. They of course, could be put side by side, but because in part of the imperfect combustion which took place on the dead plates, and what was a more serious matter, in consequence of the necessary collection of ashes and clinkers on those plates, it was out of the question to get a continuous uniform fire bed across the entire width of the furnace. Its doors had to be opened every now and then, so that the residuum of combustion could by hand be raked off the dead plates. Every time this happened, the temperature went down. The permissible length of the retorts was limited by the effective reach of the hand operated rake or hoe.

Industry called for something at once more powerful and less wasteful. Men knew how to make an underfeed furnace, which could be automatically fed. What was wanted was one which would in addition clean itself, so that deposits of combustible material would not break up the continuity of the fire bed, or have to be removed in ways which wasted costly heat. There is no doubt that Taylor's stoker, in its commercial form, met these requirements, and there is equally little room to question that the ways in which the results are obtained were described in his patent. What he did was simple enough. He gave the retorts and the fire bed supported by them a slope downwardly from the end through which the coal came. The combined effect of gravity and the jarring of the pushers as they drove the fuel forward kept the ashes moving down hill until, at the end of the retort, they fell upon a dump grate, which could easily be manipulated from the outside without opening the furnace at all. For the dead plates, no longer needed to support the ash and clinker, he substituted twyer blocks with mouths flaring towards the retorts. Through these came air under pressure to supply the needs of combustion at the useful point. The tendencies of the coal, as it was pushed up and came under the influence of heat, to swell and to become somewhat sticky, caused it to a considerable extent to arch over the twyer blocks, and thereby aided in preserving the continuity of the fire bed, and to a considerable degree protected the blocks from the damage the burning coal, if always resting directly upon them, would do. It became practical to put side by side as many retorts as any one had use for. No matter how numerous they were, the fire bed would stretch over them all in an unbroken burning surface. As there was no occasion for rakes or hoes, the effective range of their usability no longer restricted the length of the retorts.

It is to these things that the claims in suit relate, and each and every one of them may be read upon defendants' devices. In the light of the disclosures of the prior art, are they invalid altogether, or must they be so narrowly construed that they will not cover defendants' structures? Many prior patents have been offered in evidence. It would serve no good purpose to discuss them. It is quite possible that defendants are right in their contention that every single element of the combination described in any of the claims in suit is to be found somewhere in the prior art, but I have not been able to discover in any one of them the combination itself, and that is what Taylor invented, if he invented anything. His patent has nearly expired. During all these years, it has been respected. Some of the most wealthy, powerful, and resourceful corporations in the country have preferred to accept licenses and pay tribute rather than risk litigation over it. Defendants, it is true, assert that all this is of little significance, because in their view the acceptance of licenses and the payment of royalties was all a part of a scheme to evade the provision of the anti-trust acts, but they have offered no testimony to support this charge, and it necessarily falls.

This opinion should not end without notice of a phase of the case as to which at the hearing there was much said. In the Taylor patent, there is described what he called a pivoted pusher, but which has been referred to less respectfully, but more strikingly, as a flapper. It has never been used in actual industrial operation by Taylor, by any of the succeeding owners of his patent, by the defendants, or by any one else. Defendants say that it could not have been made to work, and, as that is the only form of pusher shown in the patent, no operative device is disclosed, and the patent is therefore void. It is not as cheap a pusher to make or to maintain as those which everybody now uses. Perhaps it would cost more to operate, but I see no reason to doubt that it would work, if it was worth anybody's while to try it practically, and that is all the law requires. Taylor doubtless wanted, if he could, to escape the Jones and the Roe patents. Like other parents, he may have become especially attached to it as a somewhat peculiar child of his brains; but he did not in the claims in suit limit himself to it, as he did in the other claims not here in issue.

It follows that the claims in suit must be held valid and infringed. The usual decree for an injunction and an accounting may be drafted.

⏾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes