### SANFORD RILEY STOKER CO. v. FREDERICK IRON & STEEL CO. et al.

(District Court, D. Maryland. August 8, 1921.)

No. 217.

Patents ⬦⟿328—1,152,222, for improvement in underfeed stokers, held valid and infringed.

The Riley patent, No. 1,152,222, claims 3, 9, and 10, for an improvement in the underfeed stoker of the Taylor patent, No. 778,812, consisting of the addition of an extension grate at the foot of the Taylor retort, upon which the portion of fuel passing unconsumed through the retort may be efficiently burned under forced draft, *held* the invention of the patentee, valid, and infringed.

In Equity. Suit by the Sanford Riley Stoker Company against the Frederick Iron & Steel Company and the Frederick Engineering Company. Decree for complainant.

Louis W. Southgate, of Worcester, Mass., and Edwin F. Samuels, of Baltimore, Md., for plaintiff.

N. Rufus Gill & Sons, of Baltimore, Md., and Jonathan S. Green and E. W. McCallister, both of Pittsburgh, Pa., for defendants.

ROSE, District Judge. The plaintiff owns letters patent No. 1,152,-222, issued August 31, 1915, upon an application made by one Riley five years before for various improvements in the Taylor underfed stoker, a general description of which will be found in the opinion this day handed down in the case of the American Engineering Company against the defendants herein. 274 Fed. 861. The Riley patent has 14 claims, most, if not all, of which are limited to somewhat precise

___

⬦⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

structures by the number of their elements and the rather detailed specification of their distinguishing characteristics. We are here concerned with but three of them, the third, the ninth, and the tenth. An element of every one of these is an extension grate at the foot or end of the Taylor retort, and intended to furnish a support upon which the portion of the fuel passing unconsumed through the retort may, under forced draft, be efficiently burned.

One of the defendants, the Frederick Iron & Steel Company was employed by the American Engineering Company, when the World War overtaxed the latter's facilities, to make parts of the Taylor stokers, equipped as they were with the Riley grates, for the making and selling of which the American Engineering Company held a license. The other defendant, the Frederick Engineering Company, was organized in 1920 for the purpose of turning to profitable use the skill and experience in the manufacture of stokers of a Mr. Lundgren, who, at one time, was in the employ of a predecessor of the American Engineering Company, and subsequently, for a number of years, was in the stoker department of the Westinghouse Electric & Manufacturing Company, also a licensee under the Riley as well as the Taylor patent. The advertising literature of the Frederick Engineering Company says that in the development of its stoker no radical change has been made from the general well-known type, "and that its design is the result of more than 12 years of specialized experience of this particular kind of stoker." In short, the defendants knew that there was a lucrative demand for the device. They had been making it, and they did not want to stop. They knew there were certain highly useful, if not essential, features in these stokers, as the public knew them, protected, as it was claimed, by patents under which they had no rights.

Naturally enough, they persuaded themselves that the patents were invalid, or must be so narrowly construed that they would not cover the stokers which the patentees and their licensees had been putting on the market, or that a few changes, unimportant to the ultimate users, would effectually avoid infringement. If they are correct in any of these respects, they have a right to do what they have done, and are doing, no matter how their attention was first drawn to the business, or how closely they copy plaintiff's commercial device. On the other hand, that the stokers, as they have been made and sold, have so greatly commended themselves to popular favor that the defendants do not deem it expedient to make any "radical change" in them may strengthen the presumption of novelty and utility in the patents, in accordance with the disclosures of which they have been made, if any such patents there are.

Before passing upon the defences of nonpatentability and noninfringement, attention should be given to still another ground upon which it is said that the patent in suit, or at all events the claims here in issue, are invalid. It is strenuously contended that the real inventor of an essential element of every one of them was not Riley, but one Wood. In 1908, the then owner of the Taylor patent, through an independent contracting corporation, installed three Taylor stokers, of

274 F.—55

six retorts each, in the plant of the Electric Corporation of Lowell, Mass. It turned out that, under "peaked," or overload conditions, pressure could not be maintained, although there was an excessive consumption of coal. Much unconsumed coke passed through the retorts and piled up on the dump plates to an extent sufficient to clog the free operation of the retorts themselves. The frequent dumping of the plates was the only remedy, and that carried much valuable fuel into the ash pits. The Electric Corporation claimed that guaranties of economy and efficiency had not been fulfilled. The then owner of the Taylor patent had apparently had some prior experience with similar difficulties, for Riley, who was then in its employ, had for some time been thinking how they could be remedied. He believed that they could be in large part obviated, if means could be devised to continue highly efficient combustion upon the dump plates themselves. The fuel bed upon them would ordinarily be comparatively thin, and it appeared impracticable, and perhaps undesirable, to attempt to feed coal into them from below. The fire on them would, in its essentials, be an overfed one. Forced draft was required, if combustion was to be approximately complete. Grates must therefore take the place of mere dump plates, and they would have to be so constructed that they could be oscillated or otherwise moved sufficiently to dump the ashes off them into the pits.

In such a structure as the Taylor stoker it was not at first sight obvious how the air could be carried from the compressed air chamber under the retorts and the twyers to these grates and leave the latter still movable. Riley admits that up until about November, 1909, he had seen no solution of the problem thus presented, although he had given much thought to it. There were conferences between him and various representatives of the Electric Corporation, of whom Wood, then the engineer in direct charge of the operation of its plant, was one. At one of these interviews, Wood claims to have suggested the device of the claims in suit. Riley had with him a blueprint, and upon this Wood says he made certain marks with a red pencil, showing how to do what was wanted. This print is still in existence, and has been produced in evidence, and the red lines are visible upon it. Wood's story that he made them is corroborated by some of the others then present, although Riley says that he put most of them on with his own pencil, and that the idea they embodied was his. Whosever they were, much remained to be thought out and designed before a workable structure could be constructed. Whatever was the part Wood played at the conference in question, it is admitted that for all practical purposes he thereafter dropped out of the matter.

An extension grate, with forced draft as described in the patent, was put first under one of the Electric Corporation's boilers, and subsequently under the others. It gave satisfaction. In March of 1910 Riley applied for the patent in suit, and of course made the usual inventor's oath. Wood has never done anything to assert his rights, or even to advertise them, except to refer to them in some conversations with persons other than Riley, who had at the time been interested in the work done at Lowell. There is no reason to question

either his good faith or that of any of the witnesses, who after the lapse of some 11 years give more or less detailed and precise corroboration of the story he tells. His and their present belief that he, and not Riley, was the inventor of the patented grate, is doubtless genuine enough. It is not the first or the thousandth time that the world has applauded statesman, general, scientist, or patentee for a policy, a strategy, a discovery, or an invention to the credit of which some one else was entitled, in the latter's estimation and in that of his friends, nor will it be the last. It is sufficient here to say that if at this late date, and upon evidence no stronger than that here presented, another than the patentee can be held to have been the inventor, few valuable patents would be safe.

Little need be said as to the state of the prior art. Riley's contribution to its development was in a sense, perhaps, not a great one. It certainly does not suggest that it was the result of a flash of unusual genius. Nevertheless, it added much to the economy and efficiency of the now so generally used underfed stokers. The overwhelming majority of those installed in recent years have the Riley grate, and defendants have not felt that they could sell theirs without it; not, it is true in the precise form shown in the patent, but in one which one of the licensees under the Riley patent has preferred, there, however, being seemingly no reason to question that it embodies the invention of the claims sued on, whether it does or does not improve upon it. There is no close anticipation of the combination Riley devised, and nothing in the record sufficient to rebut the presumption of novelty raised by the patent itself.

It follows that the plaintiff is entitled to the usual decree for an injunction and for an accounting.