## FREDERICK IRON & STEEL CO. et al. v. SANFORD RILEY STOKER CO.

(Circuit Court of Appeals, Fourth Circuit. February 6, 1923.)

No. 1951.

1. Patents ⬤90(7)—Inventor may adopt suggestions of another without losing rights.

An inventor, who is working to reduce his idea to practice, may adopt the suggestions made by another without losing his right to a patent therefor, especially where the other took no steps to assert his ownership of the invention, and any rights he might have thereto had been lost by his inaction.

2. Patents ⬤328—1,152,222, claims 3, 9, and 10, for underfeed stokers, held valid and infringed.

The Riley patent, No. 1,152,222, claims 3, 9, and 10, for an improvement in the Taylor underfeed stokers, whereby a larger quantity of fuel could be fed and consumed, without clogging the device or wasting the fuel, held valid and infringed.

3. Patents ⬤177—Solution of difficult problem by use of old elements entitles claim to liberal construction.

Even though the elements in the invention were all old in the art, the selection and regrouping of those elements, whereby a difficult problem, which others had failed to solve, was finally solved successfully by the inventor, by the exercise of considerable ingenuity, the claims are entitled to as liberal a construction as the prior state of the art and their restricted language will permit.

4. Patents ⬤178—Limited claims cover equivalents commensurate with scope of invention.

The fact that the claims in a patent are limited in scope does not deprive them of all the benefits of the doctrine of equivalency, if those benefits are availed of in a manner commensurate with the scope of the invention, and without doing violence to the language of the claims.

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the District of Maryland, at Baltimore; John C. Rose, Judge.

Suit in equity by the Sanford Riley Stoker Company against Frederick Iron & Steel Company and another, for infringement of patent. Decree for plaintiff (274 Fed. 864), and defendants appeal. Affirmed.

Melville Church, of Washington, D. C., and Edgar W. McCallister, of Pittsburgh, Pa. (John S. Green, of Pittsburgh, Pa., on the brief), for appellants.

Louis W. Southgate, of Worcester, Mass. (Charles T. Hawley, of Holden, Mass., on the brief), for appellee.

Before KNAPP, WOODS, and WADDILL, Circuit Judges.

KNAPP, Circuit Judge. The appellants were defendants in the court below, and they so will be designated in this opinion. The suit was brought for alleged infringement of two patents owned by the plaintiff company, namely, No. 1,152,222, issued August 31, 1915, and No. 1,090,651, issued March 17, 1914, both for improvements in underfeed stokers. The latter patent was withdrawn at the trial, and therefore has not been considered. The bill charges infringement of claims 3, 9, and 10 of patent No. 1,152,222, herein referred to as the Riley patent, and they are the only claims in controversy. The trial court held these claims valid and infringed, and entered the usual decree for an injunction and accounting. 274 Fed. 864. From this decree the defendants appeal.

The Riley patent, No. 1,152,222, contains a statement to the effect that it is founded on a stoking apparatus of the type shown and described in the patent to Taylor, No. 792,862, and has for its object, among other things, the obtaining of a more complete combustion of the fuel used, and thus avoiding loss of fuel in the ash, which was found to be incidental to the operation of the Taylor stoker. Both the Taylor and Riley patents are fundamentally coking underfeed stokers, and the first of the kind that appears is shown in the patent to Jones, No. 470,052, which was followed by the Daley patent, No. 644,664.

In both the Jones and Daley stokers coal was introduced into a receptacle or retort, which had an open top, was closed at the sides and one end, and had the other end open to permit the entrance of coal. Into the lower part of the receptacle coal was forced through the open end by rams or pushers; the introduction of successive charges acting to force the fuel previously fed into the receptacle to the top of the latter. The upper portion of the body of coal as it emerged from the receptacle was ignited, and combustion of the fuel maintained and promoted, by forcing air under pressure across the fuel, through pipes in the Jones construction, arranged along the sides of the receptacle, and through twyer blocks, similarly arranged, in the Daley construction. In both of these structures the effect of maintaining combustion on the top of the mass of confined coal, from which air of an amount to cause combustion was excluded, was wholly or partially to coke the coal in the retort below the air supply. Consequently volatile gases were liberated from the coal, and these in rising mingled with

the air at the top of the retort and were burned. The smoke also passed upward through the burning fuel bed at the top of the retort and was to a great extent consumed. By this economical use of fuel, as compared with the old method of introducing fresh green coal upon the top of a burning bed, enormous saving was accomplished.

The practical defect in the Jones and Daley stokers was that an uninterrupted uniform burning of the fuel to maintain a constant heat could not be carried on, because at frequent intervals it was necessary to expose the fire bed to outside cold air during the removal of ashes. As fresh coal was fed into the lower part of the retort, the coal previously received was coked, forced upward, and burned. Consequently the ashes from the burning fuel at the top were spread out from the sides of the retort and received upon dead plates extending laterally from the sides of the retort, and when the quantity of ashes was such as to interfere with the operation of the furnace rakes introduced through apertures opening into the outer air were used for their removal.

The admission of air in this manner cooled the interior of the furnace and required a large consumption of fuel to bring the temperature back to the required point after each ash removal. Besides, the ash was necessarily raked by hand, and this involved exhausting and expensive labor. The area of the dead plates which could be raked was limited, and consequently the size of the furnace was much restricted, and because of the location of the dead plates, and the necessity for free access to them, it was impracticable to arrange the retorts in groups.

In the Taylor construction, retorts open at each end, and twyer blocks arranged on both sides of the retorts for directing air under pressure, which is received from an air trunk, extending beneath and transversely of the retort to the fuel forced upward to the tops of the retorts by successive charges, and dump ash plates, arranged at the rear or discharge ends of the retorts and twyer blocks, are employed. The advantageous and distinguishing feature of the Taylor device is that the retorts and twyer blocks are inclined downward from their feed to their discharge ends, and that therefore the fuel is moved from the point of introduction, through the combustion zone and to the point of its discharge upon the dump plates, by the combined action of the pushers and gravity. Moreover, the twyer blocks are of such form and arrangement in respect to the retorts that their upper faces form lateral extensions of the tops of the retorts. Consequently, as the coal is forced into the lower portions of the retorts, the burning coke at their tops flows out over and covers the twyer blocks, resulting in the maintenance of a continuous fire bed extending over the retorts and twyer blocks during the operation of the stoker. This construction permits of unlimited duplication of retorts and twyer blocks, thus allowing the installation of a furnace of any desired size. The dump plates are inclosed by the walls of the furnace, and are operated from outside the latter, so that, of course, there is no cooling of the furnace incident to ash dumping.

The Taylor stoker was found to operate successfully under ordinary working conditions, but it developed in practice that when a substantial increase of boiler pressure was periodically necessary, and largely increased quantities of coal were introduced to secure it, there was a failure to reach the desired end. The introduction of increased quantities of coal caused large amounts of uncoked coal and unconsumed coke to be moved to and deposited upon the dump plates, on which little burning took place, and where it rapidly accumulated and checked discharge from the retorts and twyer blocks. The necessity for keeping the dump plates clear, by frequent dumping of the partly burned fuel, which was wasted, involved prohibitive expense, and the net result of the attempt to supply the fuel in quantities sufficient for the purpose mentioned was a failure to maintain the required heat and a great waste of fuel.

In 1908 several of the Taylor stokers were placed with the Electric Corporation, of Lowell, Mass., and were used in connection with its plant for generating electricity for lighting purposes, etc., where the requirement for increased power at certain times of the day was imperative. Failure of the stokers properly to function under excess load conditions naturally led to the serious consideration of means for curing their inherent defects.

Riley, who was employed by the then owners of the Taylor patent, had several conferences with representatives of the Electric Corporation, among them James H. Wood, who was the engineer in charge of the plant of the corporation, at which conferences the defects of the stoker were discussed. Numerous suggestions as to changes and additions were made, but, as the problem presented was difficult of solution, no remedy was quickly found. The requirements were many. A mere lengthening of the retorts and of the coacting elements would not avail, because in the end, under feed of large amounts of fuel, clogging would ensue. What was needed was some means whereby the partly consumed fuel which was deposited upon the dump plates, when large quantities of fuel were introduced, would entirely be consumed, to aid in producing the additional heat and to avoid waste of fuel. For this purpose the dump plates had to be changed in form, so as to become in effect grates on which burning could take place, and air under pressure had to be supplied to promote combustion on them. Furthermore, the air had to be supplied to the grates in a manner to vary in quantity with that of the air which was supplied to the fuel at the tops of the retorts and on the twyer blocks, in order that it might be efficient during the feeding of either small or large quantities of fuel to the retorts, and the grates had to be capable of being agitated to break up their load to permit the penetration of the air.

Riley had been trying since 1907 to devise means for overcoming the defects in the Taylor stoker above outlined, and at one of the conferences submitted a blueprint illustrating a construction he had thought of for the purpose. At this conference it appears that Wood indicated on the blueprint some ideas which he had of additions in the nature of improvements on the stoker. It may well be that the suggestions made by Wood were adopted by Riley and ultimately incor-

porated in the stoker additions described in the Riley patent. However this may be, Riley continued his efforts, and finally, in 1909, the addition which is the subject-matter of his patent was made to the stokers in the Lowell plant.

This addition or improvement consists of a fuel support provided with an interior air chamber mounted adjacent to the discharge ends of the retorts in a manner to permit oscillation; the supporting surface being in the form of steps with air spaces between them communicating with the air chamber, a connection between the air trunk and the air chamber, and means for oscillating the support. After passing through the usual preliminary stages necessary to ascertain its best operation and manipulation under varying conditions, it gave eminently satisfactory results.

[1] It is contended by defendants that Wood, and not Riley, is the actual inventor of the improvement as set forth in claims 3, 9, and 10 of the Riley patent. The contention that Wood was the inventor may briefly be dismissed. At a conference when he and Riley were present he made suggestions and pencil indications of a proposed construction, though not identical with that finally produced by Riley. But there is nothing to show that Wood took any of the usual steps to assert his ownership of the invention; on the contrary, he contented himself with claims uttered at various times, generally, if not entirely, after the improvement was perfected and put into practical operation. Any rights he may possibly have had were annulled by his inaction long prior to the bringing of the suit on the Riley patent. To this it may be added that, even if Riley made use of any of Wood's suggestions, it by no means precludes his right to a patent.

"In reducing an idea of means to practice, an inventor has a right to avail himself of the constructive skill and ingenuity of others; and the suggestions which he may derive from them, and the improvements which he may adopt in consequence of these suggestions, belong to the embodiment of his invention and not to its essential character. Hence no notice is taken by the law either of the suggestions or their author." The Law of Patents for Useful Inventions, Robinson, § 393.

The authority given, among others, for this statement, is the ruling of Mr. Justice Clifford in the leading case of Agawam Co. v. Jordan, 7 Wall. 583, 19 L. Ed. 177. The principle there laid down has, so far as we are aware, uniformly been adopted in subsequent decisions on the subject of suggestions to inventors.

[2] It seems to be established that the device produced by Riley met an urgent need, and that as a result of its adoption an extraordinarily large number of the Taylor type of stokers have gone into satisfactory and profitable use. These facts alone would not set the mark of patentability upon Riley's invention; they are influencing, but not conclusive.

[3] Claims 3, 9, and 10 of the patent, the infringement of which is specifically charged, are all limited in scope, and it is contended by defendants that, by reason of the prior art and by the conduct of the application in the Patent Office, they are necessarily more limited than the language employed in them would indicate. It is true that

every element in each claim is found in the illustrations of the prior art; but it is equally true that all the elements are not found in any one of the patents or publications relied upon. The law is well settled that it is not permissible to take features separately from patents and publications illustrating the prior art, and, in the light of the disclosure of the Riley patent, so aggroup or combine them as to produce Riley's structure, and then set up this aggroupment or combination as showing lack of patentability of the structure. Having clearly in mind the state of the art prior to Riley's invention, it is apparent that Riley did more than merely adopt what before was well known. While he made use of many old features, the exercise of considerable ingenuity was required to devise an organization which would meet the peculiar situation which he confronted. The fact that Riley and others gave long and serious thought to the subject before a satisfactory apparatus was designed, that no one else succeeded, and that he finally did, goes far to prove the correctness of this conclusion. This being so, the claims are entitled to as liberal a construction as the prior state of the art and their constricted breadth will permit.

In Keystone Mfg. Co. v. Adams, 151 U. S. 139, 14 Sup. Ct. 295, 38 L. Ed. 103, the court says:

"But when, in a class of machines so widely used as those in question, it is made to appear that at last, after repeated and futile attempts, a machine has been contrived which accomplishes the result desired, and when the Patent Office has granted a patent to the successful inventor, the court should not be ready to adopt a narrow or astute construction, fatal to the grant."

The contention of defendants that the words "mechanism for operating the grate," in claim 3, and "means for giving a limited oscillative movement to said support," in claim 9, imply that such "mechanism" and "means" should be limited, and be effective only when construed to have read with and limiting them some words indicating that the operation is by and with the feeding ram, to cause the grate or support to feed the fuel, is not well founded. A reading of the specification of the patent shows that there is sufficiently clear disclosure of a construction to serve as a foundation for the claims as written. Two forms of oscillating means are described; one operated and timed by the movement of the feeding ram, and one operated by hand. The fact that two forms of oscillating means are described, one by hand, and one by a connection with the feed plunger, and then in the claims terms covering both are used, does not warrant a construction of the claims limiting them to either form alone.

The record contains nothing to indicate that ample feed of fuel was lacking in the Taylor stoker. What was wanted was a more complete burning of the fuel. Hence the primary reason for oscillating the adjunctive overfeed grate was to agitate the fuel to allow air to pass from the interior of the grate up through the fuel to promote combustion on it, and not to aid in feeding the fuel by a continued movement.

[4] Careful consideration has been given to the application on which the Riley patent was issued, having in view the contention that the words, "air ducts rising on a forward slant from said trunk and having

air outlets at the rear," introduced by amendments into claims 9 and 10, and the words, "means for giving limited oscillative movement to said support," introduced by amendment into claim 9, so limit these claims as to preclude their being construed to cover defendants' stoker. Keeping in mind that the structure which forms the subject-matter of these claims is designed to insure the completion of the burning of the fuel after passing from the retorts and twyer blocks, it is immaterial whether the adjuncts of these parts are identical in defendants' stoker with what is shown and described in the patent, provided they are substantially equivalents in operation and have no effect on the condition of the fuel when it reaches the overfeed grate on which final burning is to take place. The claims are limited in scope, to be sure; but this does not deprive them of the benefits of the doctrine of equivalency, if those benefits are availed of in a manner commensurate with the scope of the invention and without doing violence to the language of the claims. In our view of the matter the retorts, twyer blocks, and accessory parts of one structure must be deemed the substantial equivalents of those of the other. As the Supreme Court says in the Paper Bag Case, 210 U. S. 405, 28 Sup. Ct. 748, 52 L. Ed. 1122:

"It is manifest, therefore, that it was not meant to decide that only pioneer patents are entitled to invoke the doctrine of equivalents, but that it was decided that the range of equivalents depends upon and varies with the degree of invention."

The claims 3 and 9 as they appear in the Riley patent fairly well cover the features of the stoker to which they are directed, and it is not necessary to import to them the language of any of the claims stricken from the application by amendments in order that they may cover defendants' stoker.

Claim 10 is a narrow one, which is directed particularly to the box-like fuel supports in the form of steps, with air passages between the steps, and the brackets having conduits which communicate both with the air trunk and the interior of the fuel supports. The specific forms and arrangements of the parts as claimed are novel, so far as anything before us showing the prior state of the art is concerned, and the claim needs no forced construction to be held to cover the corresponding feature of the stoker produced by defendants.

Their stoker is made up of a number of retorts and twyer boxes alternately arranged and inclined downwardly from front to rear, an air chamber extending below and transversely of the retorts and twyer boxes, and inclined overfeed boxlike grates secured by brackets to the rear ends of the twyer boxes, in positions to receive fuel from the retorts and tops of the twyer boxes. The upper faces of the grates are stepped, and air openings are formed between the steps to allow air to pass upward from the interiors of the grates through the fuel on the grates. The brackets are hollow, and form conduits from the air chamber to the interiors of the grates. The grates are so disposed on the brackets as to allow them to oscillate. A shaft extends through the grates, and means for oscillating the grates through the shaft are provided. The substitution of the air chamber for the air trunk of

the Riley patent, and various modifications in the forms of the parts used, and some minor additions, are to be noted, but in substance the structures are identical in purpose and operation.

In Winans v. Denmead, 15 How. 330, at page 343 (14 L. Ed. 717), the Supreme Court, in considering a patent having essentially narrow claims, says:

"Where form and substance are inseparable, it is enough to look at the form only. Where they are separable, where the whole substance of the invention may be copied in a different form, it is the duty of courts and juries to look through the form for the substance of the invention, for that which entitled the inventor to his patent, and which the patent was designed to secure. Where that is found, there is an infringement, and it is not a defense that it is embodied in a form not described and in terms claimed by the patentee."

This case is cited with approval, among others, in Sewall v. Jones, 91 U. S. 171, 23 L. Ed. 275; Eddy v. Dennis, 95 U. S. 560, 24 L. Ed. 363; and Hoyt v. Horne, 145 U. S. 302, 12 Sup. Ct. 922, 36 L. Ed. 713.

The stoker art is an old one, and many forms of overfeed grates are public property, which could have been used by defendants without infringing any existing patent. The fact that under these conditions they adopted a structure so very nearly resembling that of Riley is proof of the excellence of his improvement, and it also indicates the difficulty of devising means for reaching the desired end in any other way.

For these reasons we are of opinion that claims 3, 9, and 10 of the Riley patent are valid, and that, giving to their language its ordinary meaning, they are infringed by the defendants.

It follows that the decree appealed from should be affirmed.