## BUCKEYE INCUBATOR CO. et al. v. WOLF.

(District Court, N. D. Ohio, W. D. May 9, 1923.)

No. 510.

**1. Patents ⟺328—1,262,860, for method and apparatus for hatching eggs, held valid and infringed.**

The Smith patent, No. 1,262,860, for a method and apparatus for hatching eggs on a large scale, *held* to embody invention, not anticipated, not void for indefiniteness, not limited by the prior art, and infringed by defendant's method and apparatus, which were copied from those purchased from plaintiffs with only immaterial changes.

**2. Patents ⟺119—One patent may issue for process and apparatus to practice it.**

If invention or novelty exists, a patent may issue for a process or method invention, and an apparatus to practice it, and both may be included in one patent.

**3. Patents ⟺81—Proof of prior public use must show clear description.**

When defendant seeks to destroy a patent regularly issued by parol proof of prior public use or public disclosure, his proof must show such a full, clear, and exact description of the patented device or process as will enable any person skilled in the art to which it belongs to practice the invention, without the necessity for making experiments or changes involving invention.

**4. Patents ⟺118—Method claims not precisely fixing proportions are not void, if those can be ascertained by skilled person.**

Method claims in a patent are not void for indefiniteness, because they do not prescribe the exact proportions or exact temperatures to be employed, if those proportions and temperatures can be ascertained by one skilled in the art, who attempts to practice the method.

**5. Patents ⟺328—1,263,138, for rack and egg trays for incubator, held valid and infringed.**

The Smith patent, No. 1,263,138, for the specific construction of a rack and egg tray for use in incubators of large capacity, *held* not anticipated and infringed.

**6. Patents ⟺310(9)—Objections to verification of amended bill and to omissions therefrom should be made before hearing.**

Defendant's objections to the verification of the amended bill for the infringement of two patents and to the failure of the bill to allege that both inventions were susceptible of conjoint use are highly technical, easily susceptible to correction, and should have been insisted on before the hearing started, and will not be considered, where they were made for the first time in the written briefs.

In Equity. Suit for infringement of a patent by the Buckeye Incubator Company and another against Daniel A. Wolf. Decree rendered for plaintiffs.

Staley & Bowman, of Springfield, Ohio, for plaintiffs.
Geo. E. Kirk, of Toledo, Ohio, and F. O. Richey, of Cleveland, Ohio, for defendant.

⟺For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

WESTENHAVER, District Judge. This is the usual patent infringement suit. It is based on United States letters patent Nos. 1,262,860 and 1,263,138, both issued April 16, 1918, to Samuel B. Smith, assignor of the Buckeye Incubator Company. The defenses are invalidity for numerous reasons, and noninfringement. All the claims of both patents are in issue. These patents pertain to the art of hatching eggs. No. 1,262,860, the main patent, covers a hatching method and an apparatus for practicing it. The first three claims cover the method, and the last two the apparatus. No. 1,263,138, a detail patent, pertains to structural details of the tray rack and egg trays. Consideration will first be given to the main patent, and the detail patent dealt with later.

[1] The hatching or incubator industry is an artificial and mechanical application of the setting hen's method of hatching eggs. If the testimony is to be believed, the setting hen is a poor excuse and only half knows her business. As a hatcher of eggs she is inefficient, and as a rearer of chickens is not in a class with the artificial brooder. A careful study of her methods, however, has revealed the nature and details of the process. Certain ranges of temperature must be maintained during the incubating period. In the early stages of incubation, heat is absorbed by the egg, and as incubation advances the temperature rises, and in later stages heat is given off. In the later stages, also, oxygen is absorbed and carbon dioxide is emitted, which must be removed and fresh oxygen supplied. It is also necessary that uniformity of temperature within certain ranges and a sufficient degree of humidity should be preserved during all the stages of incubation. Except in the first stage, the eggs must be laid on their sides with the longer axis in an approximately horizontal plane, and during incubation must be turned at least once or twice a day in order to preserve the proper equilibrium of the egg content. It is said that the belief, once held, that the setting hen left her nest each day to cool the eggs, is erroneous, and was due to the necessity of obtaining food, and is not an advantage in the incubating process. During the hen's absence the temperature may be reduced below the desired level, but is not harmful if it does not fall substantially below 98° Fahr. and is not too long continued. To hatch eggs successfully by an incubator on a large scale requires the reproduction and maintenance of all these varying conditions.

The mechanical or artificial incubator art, prior to Smith, had produced a single unit incubator in which eggs were all set at one time and in one layer or level. It is not claimed that this art advanced beyond two superimposed layers, and the testimony leaves the success of that advance as doubtful. The method of heating and ventilation was with gravity and convection currents, the simplest form of which is the lamp with its chimney. To operate on a large scale, additional units were added, and the Binn Hatchery at Petaluma, Cal., had been constructed and operated with a capacity of 165,000 eggs. Obviously a hatchery thus constructed and equipped required a large amount of floor space, numerous thermostats and heating units, and a large number of employees. The evidence shows conclusively this to have been the existing state of the art, except as it is disputed by defendant's claim of prior use and public disclosure of Milo G. Hastings and of Samuel B. Smith. These alleged prior uses and public disclosures will be consid-

ered later, but, aside from them, no contention is made that the prior art as commercially practiced was other or different from that now stated.

The Smith incubating method and his improved apparatus is called the Buckeye, because it has always been made and sold under that name by the Buckeye Incubator Company. This method and apparatus are clearly and correctly described in patent 1,262,360. The elements of the apparatus are a chamber closed on all four sides; a central open corridor, to which access from the outside is permitted through a door; two egg chambers, one on each side of the central corridor; curtains or partitions extending nearly to the bottom and separating the central corridor from the egg chamber; a suitable number of stationary and tilting open mesh bottom egg trays, and a supporting egg rack in each egg chamber; a suitable number of fans mechanically operated to produce a forced circulation of air; means for heating the air, preferably coiled pipes in a heating chamber above the ceiling of the corridor and egg chambers; and restricted openings or inlets to admit fresh air and emit foul air. The details of the stationary and tilting egg racks and egg trays are specifically described and claimed in patent No. 1,-263,138, and need not now be described.

The principle of operation and the hatching method for which this apparatus is designed consist in forcing mechanically a draft of heated air downwardly through the central corridor, where it passes below the bottom of the partition or curtains and ascends through the column of egg trays to the exit at the top of the respective egg chambers. Part of the foul air is permitted to escape through the air exits, and additional fresh air is drawn in through the air inlets and returned through the central corridor and the egg chambers. A cycle of forced circulation of air through definite channels, it is said, is thereby obtained. The size and proportion of the air inlets and exits are of vital importance, as upon them depends the maintenance of sufficient moisture and oxygen within the egg chambers. This is referred to as the restricted capacity of the outlets. The temperature, it is said, may be regulated by any suitable thermostatic means. In actual operation it is claimed that a continuous forced current of suitably heated air is driven downwardly through the central corridor and upwardly through the two egg chambers, and diffused and maintained throughout the egg chambers at substantially the same temperature, and the current of air vitalized and moisture preserved in the egg chambers, and that convection currents and direct heat radiation are avoided. A specified number of trays of eggs is placed in the stationary egg racks at the top of the egg chambers, and after a predetermined time are removed and placed in the tilting egg rack, where they may be turned from side to side through an arc of not less than 90° as often as desired, usually twice a day, by the simple expedient of raising one side and lowering the other of the tray rack. The trays are again, after a predetermined time, transferred to the next lower tier, and the operation thus repeated until the eggs have reached the bottom of the tilting rack and are then ready to hatch. They are then transferred to the stationary hatching trays at the bottom of the incubator. It is also claimed that the forced draft circulation of air carries off the heat and foul air from the eggs

in the advanced stage of incubation at the bottom of the egg rack, reducing their temperature and delivering the heat to the eggs in the less advanced stages, thereby aiding the incubating process and obtaining a uniform temperature in the egg chamber.

[2] Such in brief outline is the method of hatching and the apparatus designed to utilize it. The claims need not be specifically stated. No question of invention or infringement turns on a close construction of all or any of the claims. It is sufficient to say that, in my opinion, the first three claims adequately and properly cover the method, and that the last two adequately and properly cover the apparatus. In claim 5 it is material to note that a vertically disposed partition is prescribed in place of curtains on each side of the central corridor, as is prescribed in claim 4. If invention or novelty exists, the law is clear that a patent may issue for a process or method invention, and an apparatus to practice it, and that both may be included in one patent. See Expanded Metal Co. v. Bradford, 214 U. S. 366, 29 Sup. Ct. 652, 53 L. Ed. 1034.

This incubator was first made and sold by the Buckeye Incubator Company in the year 1917. The first type, known in the record as No. 6, had a capacity of 2,440 eggs. The only other type ever made or sold, known as the No. 7, and having a capacity of 10,368 eggs, was developed during the year 1917, placed on the market in the latter part of that year, and first used early in 1918. The No. 6 has ever since been sold in large numbers and widely used, and has given uniform satisfaction. The first 31 of the No. 7 type were found defective. All the criticism found in the record of the Buckeye incubator relates to some one or another of those 31. The evidence, however, tends to show that practically all of them have since remained in use, if not in the hands of the original purchasers, then of their vendees, and that all of the defendant's witnesses who criticized the Buckeye incubator have bought and used, and are now using, both the No. 6 and either the perfected No. 7 or the defective No. 7.

The cause of the trouble with the first No. 7's was soon discovered and remedied. It does not appear that Smith ever experienced the same troubles with the apparatus developed and used by him, even of the same or larger capacity, and upon which was based his application for a patent. He was called into consultation, and at once perceived that the air was not being circulated with sufficient velocity, and advised larger openings and additional fan power. The air inlet and exits were enlarged, and the fans were enlarged from 12 to 16-inch diameter, and increased in number from 2 to 3. This remedied the difficulty. The trouble was that the small size of the inlets and of the fans did not cause the air to circulate with sufficient velocity to keep the temperature uniform and prevent hot spots. The original defective 31 No. 7's were during the year 1918, and have been since, operated successfully by opening the corridor door for short periods once or twice a day, depending on the outside temperature.

The Buckeye incubator accurately embodies, in my opinion, the disclosures of both patents. The steam jet to provide moisture has been eliminated, the heating pipes transferred from above the central corridor to a place inside of it, and wooden partitions have been substituted

for canvas curtains. This last change, as already stated, is clearly within claim 5 of the patent. The change as to the location of the pipes is a change of position only, and involves no new principle of operation and produces no new result. In both positions it performs the required function of heating a column of air driven downwardly through the central corridor. The wooden partitions perform the same function of the chamber ceiling and of the canvas curtains in preventing the direct radiation of heat from the pipes to the eggs. These changes are merely the improving and refining usually necessary and always permissible in developing commercially a patented device.

The evidence discloses a reasonable commercial success. No complaint or trouble has been experienced either in the method or apparatus, except with the first 31 of type No. 7. This is material, if at all, only in connection with defendant's contention, later to be considered, that the patent is void for want of a definite and sufficient disclosure. This incubator has not displaced the earlier single unit type, nor can it be admitted that the prodigious commercial development of the custom hatching of chicks is due to it. Many causes have contributed to this evolution of the egg-hatching business. None the less, the Smith invention has established itself in the industry as a practicable and successfully operative incubator. The Buckeye Incubator Company makes and advertises equally both types, but the growth of its business has been rapidly and progressively in the direction of the Smith type. In 1917 its sales of the earlier type were $694,203, as against $33,000 of the Smith type. In 1921 and 1922 its sales of the earlier type were $866,000 as against $280,000 of the other type. In the last 6 months of 1922 its business on the old type amounted to $656,000, as against $565,000 of the new. This success is sufficiently proved and weighty enough to lend force to the prima facie presumption that Smith discovered and invented something new and useful.

The special contentions of the defendant remain to be considered. Of these, the one most strongly stressed is the alleged prior uses and public disclosures of Milo Hastings. He was not called as a witness. No witness was called to testify what Hastings did. The evidence of his use or disclosure consists of four newspaper articles and his rejected application for a patent. The newspaper articles were published in the "Dollar Hen" in the year 1909, in "Poultry Culture" in February, 1912, in "Boston Sunday Globe" November 10, 1912, and in the "Technical World" in April, 1913. Of these articles defendant's expert says that the disclosures of the "Poultry Culture" article are the nearest and most specific description of Hastings' use or construction. The earliest article in the "Dollar Hen" may be disregarded, as Hastings there merely describes a process for maintaining temperature in cold storage and suggests how it may be applied in a hatchery. It does not purport to describe an apparatus or ever to have been put to any use. The other articles relate to two hatcheries said therein to have been constructed by Hastings, one at Muskogee, Okl., and the other at Port O'Connor, Tex. Whether either hatchery was a commercial and practical success cannot be discovered from the articles, and it is not proved by the evidence. When these articles were written, the hatcheries ap-

291 F.—17

pear to have been ready to open and do business, but the hatching appears to have been so far only experimental. The subsequent history of the hatcheries, whether they ever passed beyond the experimental stage, or were commercial failures and abandoned for that reason, or failed for some other reason, is not made to appear; but a competent witness testifies that in the latter part of 1922 he visited Port O'Connor and Muskogee, and was able to find at the former place only the abandoned site of the hatchery, and at the latter place could not find even the site where the hatchery had once stood.

Neither in the "Poultry Culture" article nor in any other is given any definite or specific description whereby one skilled in the art could reproduce the Hastings structure. These articles discuss the functions, principles, and results, and indulge in rose-colored predictions, but tell little about the method, and less about the apparatus. It is said that economy of space and cost is procured by placing the eggs in superimposed trays like the type cases in a printer's rack; but apparently each tray or case, as well as the egg chamber, was inclosed on all four sides and the eggs were turned by turning the compartment, as a whole, upside down. Something is said about driving the air from top to bottom by a centrifugal fan, but the position and location of the fan with respect to the eggs and the direction of the drafts are not defined, much less is any provision disclosed for driving the air currents in a defined channel or for removing the foul air and supplying fresh air. All that can be said is that heated air is to be forced into a chamber filled with eggs, permitted to go where it pleases, and escape by some undescribed method of ventilation. One article says that 5,000 eggs in superimposed trays are placed in one chamber 2x4x4 feet, which is manifestly impracticable. On the whole, it must be said that Hastings' disclosures do not advance the art as far as Smith admittedly had carried it in the year 1914. It cannot be said that either his method or apparatus had passed beyond the experimental stage or solved the problem later solved by Smith. It does not appear that he has contributed anything to the ultimate solution of the Buckeye type of incubator.

Hastings filed, April 25, 1911, an application for a patent. This application was rejected for want of patentability and finally abandoned. It is immaterial to inquire what place in the art is to be given to an abandoned application, or whether the invention thereof is abandoned to the public or to a later inventor. Treating this abandoned application as a disclosure of the existing state of the art, it adds little or nothing to the Hastings publications, and, when examined, must be admitted to be impracticable and inoperative. He describes his invention as a hatchery in which better ventilation is secured by substituting a forced draft for gravity drafts. All that he claims as new in his apparatus is a centrifugal fan. The specification and drawings disclose an apparatus which, in the light of our present knowledge on the subject, is known to be impracticable and inoperative. As described, it merely drives heated air down one side of an egg chamber, and permits it to filter through fabric or perforated partitions into the egg chamber, and escape, if it can, on the other side. No provision is made for removing foul air, or supplying fresh air, or conserving mois-

ture. No well-defined channels for the circulation of the air are provided. As an invention it was in a class with the Cyphers patent, and should be held invalid for the same reasons. See Jones v. Cyphers (2 C. C. A.) 126 Fed. 753, 62 C. C. A. 21. It was, in my opinion, rightly rejected by the Patent Examiner as being devoid of novelty and invention, notwithstanding an earnest and ingenious appeal of able patent counsel. It should be noted that the Patent Examiner, G. R. Ide, who rejected it, was the same Examiner who later passed and allowed both of the Smith patents.

The alleged Smith prior uses relate to the stage of development to which he had advanced his incubator in the year 1914. His application for his main patent was not filed until October 26, 1916, and inasmuch as the hatching season ends at an earlier date in the year, it is contended that what was done by Smith in 1914 was more than two years prior to his application date, and if his use was public, and his method and apparatus not merely in the experimental stage, this would be a prior public use. Plaintiff concedes the law to be as asserted, but denies the alleged facts.

Much testimony was introduced on this issue, which need not be reviewed at length. Briefly, Smith had constructed and operated at Attica, Ohio, prior to 1913, a one-chamber hatchery. During the winter of 1912–13 he constructed at Attica a hatching apparatus, which was transported to Cleveland and installed in an abandoned church on West Madison avenue. This hatchery was operated by him with one or two employees during the years 1913 and 1914 with greater or less success and the product was sold commercially. Smith developed, as he claims, later and in this same building, and as a result of his experimentation, the completed and successful apparatus and method disclosed and described in his main patent. The testimony of his employees, Mr. and Mrs. Carrick, called for the defendant, is, in my opinion, too indefinite and uncertain a basis upon which to find a prior public use. Yet the only substantial point of difference between them and Dr. Smith and his supporting witnesses relates to one feature only of the hatching method. The witnesses agree that the curtains or partitions of the central corridor were absent; that the heating pipes were located in the floor of the compartment, so as to radiate heat directly towards the bottom trays of eggs; that the restricted air inlet and outlet openings to control the vitalization of the air and conserve its moisture had not yet been installed; and that the tilting tray racks claimed in the detail patent had not yet been constructed, but that a different method was used of tilting the trays and turning the eggs from side to side. The absence of these essential features demonstrates that Dr. Smith's invention was yet in the experimental stage, and that in 1914 he had not yet achieved success. The Carricks, however, it is said, prove that during the year 1914 Smith had adopted a method of hatching eggs from top to bottom of the egg chamber. This would seem to be impracticable, in view of the location of the heating pipe next to the bottom egg trays, where the highest temperature is developed in the incubation process. But, even if true, the distinctive differences already pointed out are so marked that setting eggs at the top and moving them from level to level towards the bottom cannot be regarded as a

disclosure of the Smith hatching method, much less of the Smith apparatus.

It is further said that Smith, in 1920, stated to the editor of the "Reliable Poultry Journal" that he had been using with success his hatching method during the preceding five seasons, which would carry it back to and including the year 1914. This statement is found in ·a flamboyant newspaper interview, in which a high degree of accuracy is not expected nor usually found. And it is worthy of note that Smith, in soliciting his patent, filed affidavits claiming only that his method and apparatus had been successfully used during the year 1916 and makes no claim of an earlier use. Upon these facts it cannot be held that there is shown any use by Smith, public, private, or experimental, different from that which Smith admits was .practiced during the 1914 season.

[3] Defendant is trying to destroy a patent, regularly issued under all the safeguards of the patent law, by parol proof of prior public uses or public disclosures. Proof thereof must show such a full, clear, and exact description of the patented device or process as will enable any person skilled in the art to which it belongs, to practice the invention without the necessity for making experiments or changes involving invention. See Sparks-Withington Co. v. Jay (6 C. C. A.) 270 Fed. 449. Or as was said in Seymour v. Osborne, 11 Wall. 516, 555 (20 L. Ed. 33):

"Mere vague and general representations will not support such a defense, as the knowledge supposed to be derived from the publication must be sufficient to enable those skilled in the art or science to understand the nature and operation of the invention, and to carry it into practical use."

These principles are elemental, and citation of authority would be superfluous. Neither the Hastings publications, nor his rejected patent, nor Smith's method of hatching and apparatus of the year 1914, nor the abandoned experiments of Dr. Charles A. Cyphers, not specially relied on by defendant, measure up to these exacting requirements of the patent law.

Dr. Cyphers' experiments were from 1894 to 1907. He attempted to utilize forced drafts, and attempted to set the eggs in superimposed layers. As applied experimentally on a small scale, with less than 200 eggs, he believed it a success, but frankly admits that he found it a failure when he undertook to apply it on a large scale, and finally abandoned it in 1907. In 1920, when he again entered the field, his development was along the lines of the Smith patents, and so close thereto that he abandoned them, because, as he says, he did not wish to face an infringement suit. His description of his 1920 doings would serve for an advertisement of the Smith incubator. In a letter addressed to F. Knapp, dated December 15, 1920, describing a new incubator, called the "new Buffalo Mammoth," he says:

"'Buffalo Mammoth' is exceedingly simple in design and in operation. The air circulation is positive, all air passing through a 12-inch electric fan, which forces it through definite and restricted channels. It is sufficiently rapid to distribute the warmth with absolute evenness throughout the hatcher. There are no 'hot spots'—not even near the radiator."

These are the distinctive features of Smith's method and apparatus.

[4] The method claims of the Smith main patent are said to be void for indefiniteness. In support of this contention it is urged that the temperature, the humidity, the velocity of the air current, and the restrictions of the air outlets to permit the escape of foul air without undue loss of moisture are all essential elements, and that the specifications give no proper proportions whereby these features can be realized and the method practiced, except as to the range of temperature, and that the teaching of the patent in that respect is erroneous and misleading. On the hearing this attack upon the patent impressed me more forcibly than any of the others, and has been given careful consideration.

The maximum range of temperature, 105°, is higher than good practice requires, and if applied too long to eggs in an advanced stage of incubation would be harmful, if not fatal. It was excessive temperature, particularly in spots, that made the first 31 No. 7's defective, and this defect was remedied by opening the corridor door at intervals at least twice a day. In these 31, two 12-inch fans only had been installed, and later, on being consulted, Smith advised that the air was not being circulated with sufficient velocity. Thereupon three 16-inch fans were substituted, and with this change the No. 7 has since operated with satisfaction to all purchasers. Aside from this incident, it does not appear that persons skilled in the art have experienced any difficulty in constructing incubators in accordance with the disclosures of the Smith patent or practicing therewith the Smith hatching method. In constructing the earlier and smaller No. 6 type, the Buckeye Incubator Company did not commit the same error. Dr. Smith never experienced with his original apparatus any difficulty. The apparatus is not designed to operate automatically. A person of ordinary intelligence is required to look after the temperature, humidity, and air velocity. It appears that the experts sent out by the incubator company discovered the trouble and suggested the expedient of opening the door, which remedied it.

It is true that reasonably definite proportions must exist between the intake draft and air outlets, in order to supply sufficient oxygen and moisture, and remove carbon dioxide. It is also true that a certain velocity must be attained and maintained in circulating the air in order to diffuse it properly and produce uniformity of temperature throughout the egg chambers. The absence of these conditions, it would seem, is readily observable by persons skilled in the art. The difficulty with the first No. 7, in view of Dr. Smith's success, and also the success of the earlier No. 6, was the result of some neglect or carelessness. In any event, it cannot be said, as defendant contends, on authority of Sewall v. Jones, 91 U. S. 171, 23 L. Ed. 275, that Smith omitted from his disclosures something that was known to be necessary to the practical operation of his method claims. In actual experience, persons skilled in the art have not found these disclosures so indefinite and defective as to make the apparatus inoperative without undue experimentation and change. The method claims should not be condemned, even if they recognize a temperature too high, since persons of ordinary skill

can detect the consequences thereof and still practice the method and operate the apparatus.

In this aspect, Eibel Process Co. v. Minnesota & Ontario Paper Co., 43 Sup. Ct. 322, 67 L. Ed. ——, decided February 19, 1923, by the United States Supreme Court, seems to be conclusive. Eibel's invention consisted in changing the pitch or elevation of the breast roll end of the "making wire" of a paper-making machine. The degree of pitch is not defined, except by the terms "substantial" and "high." Mr. Chief Justice Taft, delivering the opinion, says:

"Indefiniteness  *  *  *  is objectionable, because the patent does not disclose to the public how the discovery, if there is one, can be made useful, and how its infringement may be avoided. We do not think any such consequences are involved here.  *  *  *  The evidence discloses that one, so skilled, had no difficulty, when his attention was called to their importance, in fixing the place of the disturbance and ripples to be removed, or in determining what was the substantial pitch needed to equalize the speeds of the stock and wire at that place."

In support, he cites with approval, Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279, in which was sustained a claim for:

"The manufacturing of fat acids and glycerine from fatty bodies by the action of water at a high temperature and pressure."

Nor is the objection well taken that claims 4 and 5 of the main patent, and claims 2, 3, 4, and 5 of the detail patent, are void as a mere aggregation, instead of a true combination of elements. In practicing the hatching method, egg racks and egg trays are necessary elements. The egg chambers are restricted passageways for the heated air, and it is in these chambers that the uniform temperature must be maintained and the incubation process carried on. The eggs must be placed in this chamber in different levels, and moved successively from upper to lower levels, and must also be turned from side to side. The stationary and tilting egg racks and trays of claims 4 and 5 are essential elements and features of the combination; otherwise, the method and apparatus would be failures.

The prior patent art cited by the defendant discloses nothing of sufficient pertinency to call for special comment. The patent most stressed is Freas, No. 1,165,958. This patent is not in the same, or even in an analogous art, and does not, in my opinion, teach or even suggest any of the elements or features of the Smith patent. Nor is anything found in the file wrapper history of the Smith application which calls for any specific limitation on the patent claims. The application as originally filed contained 28 claims. It would seem impossible that 28 complete, separate, and independent patentable combinations could be dug out of Smith's drawings and specifications. The applicant was obviously presenting a vast number of incomplete and imperfect claims seeking to cover separately some one general or broad feature not embodying a completed combination.

The first Examiner rejected all these claims, with the exception of 24, which he held allowable with slight changes, and on rehearing G. R. Ide adhered to this ruling, except as to claim 17, which he held was allowable when made more definite. Original claim 24 is the parent of present claim 4, and claim 17 of present claim 5. No question was

made in the Patent Office that the specification and drawings did not involve invention. All the consideration there was given to the structure and form of the claims, and when these were ultimately reduced to five, correctly and adequately embodying complete and operative combinations, as disclosed in the specification and drawings, they were allowed promptly and without criticism. Two changes only were made in the specification. One was the addition of lines 41 to 54, page 1, and lines 47 to 49, page 2. These additions were made only to describe more clearly the true invention, and not to avoid any existing prior art.

In my opinion, patent No. 1,262,860 is valid, and all of its claims should be sustained. It embodies substantial and meritorious invention. It is not anticipated by prior uses, is not void for indefiniteness, and nothing appears in the prior art or in the Patent Office proceedings to require that its claims should be restricted beyond the normal meaning of the language used. It has had substantial commercial success and has found a distinctive place in the industry. It has many advantages, particularly in the matter of economy in construction and operation. A hatching method and apparatus for utilizing it, of such substantial merit and success, should not be denied the quality of invention and left unprotected against piracy, except upon grounds more substantial than any appearing in this case.

[5] Patent No. 1,263,138 is truly specific, and is limited to structural details of the tilting rack and egg trays. In an incubator of the Smith type it is necessary to place the eggs in superimposed layers, constituting, as it were, a column through which the air ascends, and must be uniformly distributed. In hatching, it is necessary, after the early stages that the eggs should be turned from side to side and their positions reversed at intervals not less than twice each day. In an incubator containing 10,368 eggs, the time consumed in turning this number of eggs by hand, as well as the breakage likely to result from careless handling, presents a serious problem. Smith solved this problem with an exceedingly simple and a highly efficient device. The specifications and drawings are clear and call for no extended description. It is sufficient to say that the tray rack is pivoted at the top of the egg chamber, and that each separate rack is pivoted at its ends, and that the egg trays are made with a longitudinal center division and with a mesh bottom. Thus constructed, one side of the rack may be raised and the other lowered, and by so doing the egg trays describe an arc of not less than 90°, which is sufficient to turn the eggs from side to side and hold them in a position nearly enough to horizontal to answer all practical purposes. This device is admirably suited for conjoint use with the main patent, and its equivalent is indispensably necessary.

Nothing in the prior art anticipates this construction. Hastings' construction, so far as can be told from the indefinite disclosures of his published articles, consisted in sliding the trays into a case somewhat like a printer's type case, and inclosing each egg tray and the compartment on all four sides. To turn the eggs, the entire compartment was turned completely upside down. This is the nearest approximation to Smith in the prior art. In the Patent Office, United States letters patent No. 559,676, issued May 5, 1896, to Christianson, No.

320,463, issued June 23, 1885, to Louis Cutting, and No. 745,458, issued December 1, 1903, to Perkins, were cited and relied on. Christianson is in the egg storage art, and is a device merely for turning eggs. Cutting is in the incubator industry, and his device for turning eggs from side to side is by rocking the egg tray on a center bar. Perkins is in the incubator art, and somewhat similar to Cutting. It discloses a trough to hold the eggs, and a transverse center bar pivoted in the middle of the tray as a rocking means to roll the eggs from side to side. The remoteness of these disclosures will be sufficiently apparent from this brief description.

On this hearing, United States letters patent No. 300,118, issued June 10, 1884, to J. N. Parker, for a portable food dryer, is cited and mainly relied on. In some details it resembles Smith; but, even if it were in the same or an analogous art, which may well be doubted, it is not, in my opinion, an anticipation, and no difficulty is perceived in finding invention of a limited type over Parker. The so-called rack of Parker is pivoted at the top, and the so-called tray-carrying racks are pivoted at the ends; but, with these details, the resemblance comes to an end. In all other respects, including result, function, and method of operation, Parker differs from Smith. I am of opinion that patent No. 1,263,138 and its several claims in issue are valid.

In the matter of infringement, no difficulty is presented. Infringement is not only plainly shown, but the defendant's conduct, it seems to me, is and has been inexcusable. In 1918 he acquired and has ever since used two of the first defective 31 No. 7's. During that season he was instructed by an employee of the incubator company how to operate them despite the defect, by opening the doors at intervals. In the early season of 1919 he bought from the Buckeye Incubator Company another No. 7 of the later construction, which has since been found uniformly satisfactory. He has been operating all three ever since. In 1920 he began to build incubators for himself of the same type, and by January, 1920, had equipped and in operation seven more, all of which he has ever since used. He asserts that he has placed boards over the air outlets and has been operating by opening and closing the doors at intervals; but he began to do this, upon his own admission, after this suit was brought. As constructed and as operated, these seven machines are exact duplicates of the second type of No. 7. His admissions to J. E. Harner and George Cugley of plaintiff company, and his letters to Cugley and to the Newtown Incubator Company, fully disclose that he was acting with knowledge of the patents.

The only modifications claimed by him for the 7 thus made consist in wiring the 3 fans all on one switch, so that all may be turned on and off at once; in reducing the size of the heater coil pipe from 1¼-inch to 1-inch; and in attaching the board partition on the inside at the two ends. These changes are wholly immaterial. These are all the changes called by him to the attention of plaintiff's agent when the latter called to investigate. They are all that were mentioned by defendant in his testimony when asked to describe the differences; but later, as an afterthought, he asserted that there were some changes of detail in the egg trays, so that they might be handled more smoothly and with less jarring. His usual method of operation is that of the patent, although

he asserts that he has experimentally hatched eggs by shifting the trays about indiscriminately instead of successively from upper to lower levels. Infringement of all the claims of both patents is clearly proved.

[6] Defendant makes some other contentions which need not be dealt with in detail. It is sufficient to say that all have been duly considered. Defendant's objection to the verification of the amended bill and to the failure of the bill to allege that both inventions are susceptible of conjoint use appear in this case for the first time in the written briefs. These objections are highly technical, easily susceptible of correction, and should have been insisted upon before the hearing started, if defendant wished to rely thereon.

A decree for an injunction and accounting will be entered in conformity herewith.